**Jan Iden BRISTOW, Appellant,**

v.

**J. Gordon BRISTOW, Appellee.**

**No. 11–91–153–CV.**

Court of Appeals of Texas, Eastland.

June 25, 1992.

Matt L. Thomas, Odessa, for appellant.

G. Ben Bancroft, Bancroft, Mouton & Wolf, Big Spring, for appellee.

## OPINION

McCLOUD, Chief Justice.

J. Gordon Bristow filed a bill of review seeking to set aside an "Agreement Incident to Divorce" which was incorporated into a divorce decree dissolving the marriage of plaintiff and Jan Iden Bristow. Based upon jury findings, the trial court set aside the property settlement agreement and divided the property between the parties. Defendant, Jan Iden Bristow, appeals. We reverse and render.

Plaintiff and defendant were married in January of 1983. They entered into a written agreement incident to divorce on June 28, 1984. Both parties signed the agreement which was prepared by defendant's attorney after the parties requested that plaintiff's attorney withdraw from the case. On June 29, 1984, a decree of divorce was entered providing that the property settlement agreement entered into by the parties was approved and incorporated into the divorce decree.[1] The bill of review was filed on November 7, 1987.

The jury found that plaintiff lacked the mental capacity to know and understand the nature and consequences of his act when he signed the June 28, 1984, property settlement agreement; that the failure of plaintiff to defend against the property settlement agreement was due to undue influence upon plaintiff exerted by defendant in an effort to gain control of a part of plaintiff's property; and that plaintiff's failure to defend against the approval and incorporation of the property settlement agreement in the divorce decree was unmixed with any fault or negligence on the part of plaintiff.

Jan Iden Bristow urges, in her first point of error, that the trial court erred in overruling her motion for a directed verdict. We agree.

The Supreme Court in *Alexander v. Hagedorn*, 226 S.W.2d 996 (Tex.1950), announced the general rules regarding equitable bill of review proceedings. The court pointed out that it is fundamentally important in the administration of justice that some finality be accorded to judgments and that grounds for attacking a judgment must be narrow and restricted. The rules are not to be relaxed merely because it may appear in a particular case that an injustice has been done. The court noted that endless litigation, in which nothing was ever finally determined, would be worse than occasional miscarriages of justice. The court held that a party in an equitable proceeding to set aside a final judgment must allege and prove:

(1) [A] meritorious defense to the cause of action alleged to support the judgment, (2) which he was prevented from making by the fraud, accident or wrongful act of the opposite party, (3) unmixed with any fault or negligence of his own.

See also *Baker v. Goldsmith*, 582 S.W.2d 404 (Tex.1979), and *Petro–Chemical Transport, Inc. v. Carroll*, 514 S.W.2d 240 (Tex.1974).

The *Hagedorn* Court held that only "extrinsic fraud," as opposed to "intrinsic fraud," will support a bill of review. The court in *Montgomery v. Kennedy*, 669 S.W.2d 309 (Tex.1984), stated that extrinsic fraud is that fraud which denies a losing litigant the opportunity to fully litigate his rights or defenses at trial. It is "collateral" fraud in the sense that it must be collateral to the matter actually tried and not something which was actually or potentially in issue in the trial. The court added:

Extrinsic fraud is conduct that prevents a real trial upon the issues involved. *O'Meara v. O'Meara*, 181 S.W.2d 891, 893 (Tex.Civ.App.—San Antonio 1944, writ ref'd). Intrinsic fraud, on the other hand, is inherent in the matter considered and determined in the trial "where the fraudulent acts pertain to an issue involved in the original action, or where the acts constituting the fraud

1. The parties remarried in February of 1986 and were still married, although in the process of divorcing, when the bill of review was tried on January 22, 1991, in the trial court.

were, or could have been litigated therein." *Mills v. Baird*, 147 S.W.2d 312, 316 (Tex.Civ.App.—Austin 1941, writ ref'd).

The record reflects that both plaintiff and defendant had serious drinking problems. Plaintiff had been an alcoholic for several years. He described defendant's influence on his use of drugs and alcohol as follows:

Q: Let's talk for a minute, Mr. Bristow, if you would, about what part in [it] if any Jan Bristow played in your consumption of alcohol and drugs.

A: Well, when—when we were first married, I was so screwed up, and I would leave the house and go over to my apartment, sometimes, to try to withdraw. And I would drink sometimes over there to try to taper off the stuff. And I would try not to drink anything.

And she would call me up at night, and she would be wanting me to come back over there. And a lot of times, I would. And I ended up starting to drink again and everything like that and getting screwed up and screwed up. And I would keep going back over there, and she would call me, and I would not want to go back over there. And several times, a lot of times, she had threatened suicide. And I'm screwed up, too. And since my father committed suicide, I'm very sensitive to that, and I would go back over there.

And, also, in our living together, I had never drunk daily all along before, except sometimes on binges, and Jan would be drinking all the time. And whenever I was not in a good mood or basically doing what she wanted, she would say, "Why don't we have some more drinks," and stuff. Now, she did not pour it down me, but it was like that.

And then at different times when she would want different things, she would— as my disease progressed, I got to a situation where I would do just about anything to keep people from yelling at me. I mean, its incredible for anybody who's never had that. And to go through the withdrawals, I couldn't do

that with somebody yelling at me, and I would have more and more to drink.

Plaintiff testified that he did not remember anything about the property settlement agreement or the divorce. On cross-examination, plaintiff testified:

Q: Now, I want to ask you, Mr. Bristow, you keep telling us that you cannot remember what went on around the time of this divorce or the signing of the agreement incident or even the first draft. But just because you can't remember today, you're not telling this jury that you and Jan didn't discuss those terms, are you?

A: I'm not saying that we didn't discuss certain terms, but I'm saying that I don't remember discussing them, and I was not competent. I could have been in blackouts or whatever when I was discussing them.

Regarding fault, plaintiff testified:

Q: Sir, it's a fact that whenever there's something that you don't like, it's somebody else's fault, correct?

A: No.

Q: Your drinking is going to be the fault of somebody else, right?

A: No.

Q: And there's some explanation for your drinking other than your fault, right?

A: No.

Q: So you're admitting to me that your drinking is your fault?

A: No, not—the drinking of the alcoholic—the deal of the alcoholism, at first, I was drinking. Nobody caused that. But what you're saying there, that when I started drinking all the time and got into all this crap here, that it was the extra drinking, when I started doing more and more, was because of the influence of Jan. I'm saying that.

Q: Well, let's see. You told us before in your testimony that you would leave the place and go to your apartment or something like that to try to dry up, right?

A: Yes.

Q: Well, obviously, at that time, you realized or you thought you had a problem.

A: At that time, I didn't know, really, about all the manifestations of the disease of alcohol. I knew I was—I had a problem with drinking too much, and I was trying to stop it.

Q: Well, why didn't you check yourself into a place or a treatment facility at that time?

A: Because I didn't know anything about them.

Q: Whose fault is that? You're going to tell this jury—you're an educated man; you've been to college; you realize you've got a problem. That's what you tell us. And you don't know about treatment programs?

A: I did not know about it at the time. I didn't know anything about a treatment program.

Q: So it's somebody's fault because you didn't know about treatment programs, right?

\* \* \* \* \* \*

Q: Well, I understand that. But you're not claiming it's all Jan's fault, are you?

A: No, I'm not claiming it was all Jan's fault, my alcoholism.

\* \* \* \* \* \*

Q: I'm just having a hard time understanding how you can go three-and-a-half years and not even understand, A, that you've been divorced, and, B, what the terms of it are.

A: I didn't say that I didn't understand that I was divorced. I just did not understand the—or even think about these agreements.

Q: Whose fault is that?

A: I was not even thinking about them. Therefore, it's—

Q: Well, it's not Jan's fault, is it, that you didn't think about these things for three-and-a-half years, right?

A: Well, I mean, I have no answer for that.

Q: Yes or no? That question can be answered yes or no.

A: Repeat your question.

Q: Whose fault is it that you didn't think about the divorce or the terms of it for three-and-a-half years?

A: I don't see that there's a fault in not knowing. That can be applied to anybody on your question, there.

Q: You're not saying it's Jan's fault, are you?

A: No, I'm not saying it's her fault that I didn't know about that.

Q: Now, I'm curious. Since Jan's not at fault for you not knowing what the terms of this decree and the agreement incident to divorce is, what are you saying that she did to prevent you from taking advantage of earlier opportunities you had to change this or to have some other agreement or to have no agreement at all?

A: There was no, even, thought of that because we—I didn't know that it existed. And we were just both drinking and stuff at the time. There was—and we were together at the time. The reason that I ever became aware of this was when I had—I was filing for divorce.

Q: Well, I take it you're not saying it's Jan's fault that you didn't choose to go have a contested hearing and have the judge decide these issues or something else way back when?

A: I wasn't thinking of anything back then other than just trying to stay alive.

Q: Are you up here claiming it was Jan's fault you were drinking back then, back in June of 1984?

A: I'm not claiming that it was Jan's fault that I was drinking.

Q: Some of that fault is on you, correct?

A: I was—I wouldn't say at fault or anything. I was just drinking then.

Q: Well, who is the one that—okay. Well, did some magical power from Mars make you go drink all that stuff?

A: No, I was—I mean, I was drinking at that time, before I met Jan, while I met Jan, but while I was around her, the influence, and the pressures and the crap increased the drinking, yes. The beginning drinking, the drinking that I was

doing, she did not cause the first of it. It was the environment I was around and things put on me that exacerbated the drinking.

\* \* \* \* \* \*

Q: If the signing of the decree and the agreement incident to divorce back in June of '84 is not completely her fault, and you can't say that because you didn't do something else isn't completely your fault, then why are we here?

A: The signing of the agreements were, I would say, was completely her fault, because I would never have signed those. The alcohol and everything else was—the incidents that made me in the condition where I would sign it. I would never sign anything like that.

Defendant, Jan Iden Bristow, testified that plaintiff was aware of the property settlement agreement and that they discussed it at length. When asked if she influenced plaintiff to drink, defendant stated:

Q: You've heard Gordon testify that from time to time if you felt like he was not in a good enough mood or wasn't feeling good that you would recommend or suggest that he drink something or take some drugs to feel better. Do you recall ever having made that suggestion?

A: No, that's one thing I never had to encourage, that boy to drink.

Q: And you never did?

A: I didn't have to.

Plaintiff's bookkeeper, Helen Jones, testified that she "notarized" the June 28th agreement and that she thought both plaintiff and defendant were intoxicated at the time it was signed.

Dr. Haskell Wright, a psychologist who had known plaintiff for many years, testified as follows:

Q: Would you say, then, that prior to the end of June of 1984, you observed that Gordon was not in control of himself?

A: Prior to '84?

Q: End of June of 1984.

A: I wouldn't—no, I wouldn't think that he was in control, no, because of the alcohol. The drugs had progressed to such a degree that I saw that there was no more drive, and there was no self discipline, irresponsible. There is a stress factor involved. There was no tolerance for stress, whatsoever.

On cross-examination, Wright stated that he had only seen plaintiff probably one time during June of 1984. Wright was not acting as plaintiff's therapist. Wright was a good friend, and plaintiff was Wright's "main investor" in a "movie project" that Wright was attempting to finance. Wright testified that he was not saying that, during the month of June of 1984, plaintiff had no "moments of lucidity." However, Wright did state that, during that period, he only saw "glimpses" of a rational mind.

On June 27, 1984, one day before the property settlement agreement was signed, the parties went to the office of plaintiff's attorney, told him that they had reached a property settlement agreement, and asked the attorney to withdraw from the case so that defendant's attorney could prepare the written agreement. Plaintiff's attorney testified that he did not think that plaintiff was intoxicated at the time. However, it was an "unusual" conference because, while they were discussing the matter, defendant was sitting in plaintiff's lap, and they were kissing. The attorney felt like plaintiff was not acting reasonably or rationally. Prior to that time, plaintiff had taken the position that, because he had spent so much money on behalf of defendant and her property, he did not owe her a "dime." The attorney stated that he did not recall anything indicating that defendant was coercing or using undue influence. The attorney stated that plaintiff "kind of lives in a world of his own sometimes. He is not affected by a lot of things in life that other people worry about."

Following the divorce on June 29, 1984, the parties continued to live together. Defendant described their relationship as follows:

Q: You don't deny, do you, that at the time that you and Gordon saw Bob that you were sitting on Gordon's lap and exchanging kisses?

A: No, we were really—when we came back from Phoenix, everything was working out, and we knew that—it was kind of like we were still talking about reconciliation, even though we were going to—my mother insisted I go ahead and go through with that.

Q: Even though you were getting a divorce the next day, you were talking about reconciliation?

A: Well, we just had an understanding. We had a really unusual relationship. But we didn't feel like we had to be married to be together.

Q: You didn't feel like you had to be married to be together? Were you thinking at that time of getting a divorce and then living together even on the 27th?

A: Yeah. He was at my house.

After viewing the evidence in the light most favorable to plaintiff, we hold that plaintiff has failed to present any evidence that he was prevented from asserting his alleged meritorious defense because of the extrinsic fraud of defendant. Furthermore, the evidence conclusively establishes that plaintiff's failure to present his meritorious defense resulted from some fault or negligence on his part. Therefore, the trial court erred in not granting defendant's motion for a directed verdict. See 3 R. Mc-DONALD, TEXAS CIVIL PRACTICE § 11.28.1 (rev. 1983); *Watts v. St. Mary's Hall, Inc.,* 662 S.W.2d 55 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

Plaintiff testified that he could not recall any of the events connected with the property settlement agreement or the divorce. There is no evidence of any extrinsic fraud exerted by defendant which prevented plaintiff from challenging the property settlement agreement at the time of the divorce. Furthermore, plaintiff cannot excuse his failure to contest the settlement agreement because of his intoxication.

It is stated in RESTATEMENT (SECOND) OF TORTS § 283C comment d (1965):

Where, however, the intoxication is voluntary, or where it results from deliberate drinking with knowledge of what is being consumed, so that the result is deliberately risked, the policy of the law has refused to make any allowance for the resulting disability, and the rule stated in this Section is not applied. Such intoxication does not excuse conduct which would otherwise be negligent.

The court in *Scott v. Gardner,* 137 Tex. 628, 156 S.W.2d 513 (1941), stated that "[v]oluntary intoxication cannot be pleaded to avert the consequences of one's own negligence." The court added: "The degree of care required of a person who becomes intoxicated does not differ from that required of a sober person." Plaintiff signed the June 28, 1984, "Agreement Incident to Divorce." That signed agreement was incorporated into the final decree of divorce dated June 29, 1984. Plaintiff's failure to present his alleged meritorious defense was not free from fault or negligence on his part.

The judgment of the trial court is reversed, and judgment is rendered that the bill of review be denied.